Your Honor, thank you, Marty Harper. If possible, I'd like to reserve two minutes at the end for rebuttal. We'll keep track of your time and if we ask too many questions we'll give you a little leniency. I just I don't want to spend much time on greetings but it's four years ago come April 14 that we were here last time and so it's good to see everybody made it back for the second round. I'd like to start off by by saying absolutely the case against American Airlines alone ought to go forward. It it's analogous to the 301 LMRA cases. When you say analogous what do you mean analogous? The same type of case where if you're going to go forward with collusion you have to prove all of the elements you'd have. Where does where does the where does the tort of collusion against an employer come from? It comes from it's a recognized cause of action. It's referred to in recognized where? In the briefs. Pardon me, Your Honor. Recognized in what? It's in case law. What cases? Well it's the flow-through type of a case that is cited by Mr. Siegel where they they had a collusion case in there but they only had two allegations in the complaint. I have to say Counsel, I'm really confused. I'm trying to figure out where the cause of action comes from. I don't see it in the statute. The Supreme Court, you know, 70, 80 years ago implied or read into the statute a cause of action against the union. I'm trying to figure out where the cause of action against the employer comes from. Now I know what the Seventh Circuit said in the United Airlines case. Is that your principal case? That's the principal case. There are not very many that go forward and most of the cases are hybrid cases that deal with a violation of a CBA. You don't have a violation of a CBA here. No, but we have a DFR that has already been proved. Right. But how do you hold an employer to violate a duty of fair representation by the union? We're not holding them to a duty to the employees. What we have is a breach of a duty by the union and an assist by the company to get that done by going into the union. the union wants to come forward and do something other than the NICOLAO, you have to make sure that they have a legitimate basis for doing that. Why does why does why does America have to have to verify the duties that are being conducted by the persons by the party that they're negotiating with? Because they have an obligation to make sure that they went into Eddington, too, asking for guidance from Judge Silver. What happens if we don't, if we do something other than NICOLAO? They got the guidance that they asked for. The guidance that they got from the judge was, you better make darn sure that there's a legitimate union purpose if you're going to use something other than the NICOLAO. They were told to do that. That was an obligation that they had going into these negotiations. And they did not do that. And I'm still trying to figure out where that duty arises to it. And if the who does the duty who does the duty run to? The duty runs to whom? In this situation, it ran it runs to the beneficiary to the pilots. To the pilots. So you're saying that American Airlines owes a duty to the pilots to make sure that their union represents them fairly and that they're not and they're not sort of helping the union out? In this unique situation, and we've had a unique situation from the very beginning, based upon what was asked for and what was given to American in Eddington, too, yes, they assumed an additional responsibility to make sure that in the that the product of the negotiations, if it changed to NICOLAO, there was a substantial union purpose for it. I have a question on another topic, and that is the statute of limitations. Your complaint was filed in February of 2017, and the matters alleged occurred in 2013, if I'm not mistaken. Why isn't this action too late in view of the three-year statute of limitations? It's not too late because we have learned from our activity here in the Ninth Circuit is that you have to wait until the case is right. When we left here in June of 15 with the opinion we had in Eddington 3, we were given an opportunity to try to convince the panel to use the NICOLAO. We did not know from the time we left here in June of 15 until September 6, 2016, that the panel was not going to use the NICOLAO. But wasn't, if there is a cause of action against the employer, wasn't it ripe at least when the cause of action against the union became ripe? I'm sorry, Your Honor, I couldn't hear you. I say, didn't the claim against the employer become ripe, and does the statute start running at least when it became ripe against the union? No, the first case that we brought against the union was for an injunction to try to prevent a riot. Okay, an injunction for a violation of the DFR, right? For an injunction not to use something other than the NICOLAO in the negotiations. The second case is for damages, and we did not know, the pilots did not know that they were actually damaged until the panel came down and said, we used something other than the NICOLAO to compute seniority. But that was contemplated in our order. In Eddington 3, we contemplated, we said, look, it's not at all clear at this point that the NICOLAO ward is going to survive. It would have to be approved by both East and West pilots, and we let it go forward. So if we weren't willing at that point to say you had to follow NICOLAO and we didn't order it, then how can there be a violation? You didn't order the panel to use the NICOLAO. You gave us the opportunity to go back and try to convince the panel to use the NICOLAO. The second arbitration panel was very cautious and very explicit as to why they were not using NICOLAO. Sure. Because there was no transition agreement in place that would have required them to use the NICOLAO. That had been taken out in the MOU with paragraph 10H. Right. Then why didn't your cause of action run from when you signed, when 10H was signed? Because we didn't know what the panel was going to do with 10H until we actually found out that they decided it was a block to them from using NICOLAO because it took out the transition agreement, which was the legal basis for the panel to use the NICOLAO. I'm down to two minutes. Is it possible for me to reserve? Yes. I'll answer anything else you have. But you certainly may do that. Good morning, Your Honors. Robert Siegel of Melvin E. Myers for American Airlines. First of all, on the direct question to the supplemental inquiry from the panel, there's absolutely no authority, there's no case law that has ever upheld what the Court referred to as a stand-alone collusion claim against the carrier. Stand-alone might have been a little bit off the mark because this is, you might call it a serial claim, right? Not really a stand-alone claim. Well, Your Honor, first of all, there is no cause of action in the Railway Labor Act for collusion by a carrier in a DFR. There are a limited number of cases. Well, there's no claim in the Act for a DFR claim against the Union. That's correct. Well, everything is, you know, judicially implied. Question is, is this judicially implied? This meaning a collusion claim of some kind, whether it's stand-alone or, say, a serial collusion claim. Why shouldn't it be judicially implied like the Seventh Circuit believes it is? I agree with you. In this case, the stand-alone claim is sequential because there was a prior claim. I agree with Your Honor on that. But the overall question of whether the courts recognize a stand-alone claim, that is one that is not brought simultaneously with the DFR breach claim against the Union. The answer to the court's question is that no case has ever authorized that type of claim, sequential or stand-alone. I'm sorry. I thought you were finished. I apologize. Please, Your Honor. I just want you to assume for the sake of this question that there is potentially or, in theory, a valid claim possible, do we even have to decide that? Because part of your argument is that the allegations in the complaint are highly speculative, and even assuming that there is such a claim, do we really have to decide that issue? Your Honor, I don't think you have to. In the district court, we argued that there was the point that the court asked on the grounds that there was no precedent for a stand-alone claim, sequential or otherwise. But fundamentally, this case can be decided on the grounds that the district court decided it. First of all, there are no plausible allegations of actionable collusion in the DFR by American. And whether it can be brought sequentially or stand-alone or not, you still have to meet the requirements that have been recognized by a small number of courts, a small number of courts, for possible collusion by a carrier in a DFR. But when those courts have recognized the cause of action, they have regularly for the last quarter century, and starting with a fairly league case, Rake Straw v. United Union, there have to be plausible allegations that the carrier has acted with discrimination or with bad faith or with hostility toward the plaintiffs, i.e., the same standard that is applied to the union. It is not enough to allege that a company accepted a union proposal in the course of reaching agreement on a collective bargaining agreement. In fact, the courts have said, we don't want that. We do not want to ask carriers to police the union at the bargaining table regarding whether or not their proposals are lawful or not under the DFR standard. So it is not enough to say that the carrier accepted the union proposal. It's not even enough to say that the carrier was aware that there was animosity between the union and the plaintiff group. That was exactly the issue that was addressed in the Rake Straw case, where there was, in fact, animosity, and that was a seniority dispute case as well. Instead, the courts that have recognized this action have said, we will allow a collusion claim to be implied against the carrier only in the very limited situation where the allegations indicate that there was a shared discriminatory hostile intent. The allegations in this complaint do not come anywhere close to that standard. They do not. In fact, the facts in this case are pretty well recognized. The carrier initially refused the union's demand that there be a date of hire list that would put the West Pilots at the bottom. The carrier then, when it — when we finally began the merger between U.S. Airways and American, the carrier took the side of these plaintiffs, these appellants. It said that these appellants should have a right at the McCaskill-Bond hearing to advocate for Nicolau separately with their own merger representatives. The union said, no, we should represent East and West Pilots in that McCaskill-Bond arbitration. We said — the company sided with the appellants and said they should have a right. In fact, we argued that to Judge Silver in the district court. She actually rejected that argument. But then there was a preliminary arbitration panel, and we were aligned with the appellants, arguing that the West Pilots should have their own — actually have Mr. Harper to be able to advocate for Nicolau. That is not collusion with the union. Those facts do not constitute collusion. The most they've alleged is that 10-H of the MOU was negotiated, they say, in secret by lawyers. That doesn't satisfy the standard for collusion. All right. Would you turn your attention to the statute of limitations issue? Yes. In other words, what's your case that the statute's wrong? Thank you, Your Honor. The — the district court didn't reach that. But I — but it is — it's plain to us that the cause of action for collusion in the DFR became ripe when the cause of action for the DFR became ripe. And — and here's why. The — the — the — the gravamen of the DFR claim was that back in 2013, the by — by placing 10-H in the MOU, the plaintiffs, the appellants, were deprived of the right to — to have Nicolau List implemented in the U.S. Airways operation in 2013 when the MOU became effective. Is that the basis of the EFR claim against the union? Yes. It — it — it is. If you read the brief that Mr. Harper and appellants filed with this court in a — in a — in an Addington III, they — they — they said directly to this court in their — in their first — in their first brief that the gravamen of the case was just that. And they said that — they said that the DFR claim was — and the obligation to implement Nicolau occurred, they said, in February 2013 when the MOU was ratified. There's another date that's possible, which is when it became effective on the merger date, which would be in December 2013. But the gravamen of the DFR claim was that — was that at that moment, the — the Nicolau List should be implemented to — to integrate the East-West pilots in the U.S. Airways operation. Recall the U.S. Airways operation continued separately until 2016. So the idea that if there is — there was a DFR breach, it occurred in — at that time. This court so ruled that the DFR breach occurred when the — when 10-H was inserted. But the alleged damages is that they did not get the benefit of the Nicolau award being implemented in the U.S. Airways operation in 2013 when the MOU became effective, which they called the single agreement that was required under the transition agreement to implicate the requirement to — for the Nicolau award. So their damages started to run for certain when the breach occurred in 2013, because they were not enjoying the Nicolau List in the U.S. Airways operation. The only issue that came up in 2016 at the McCaskill-Bond hearing was whether or not those damages would be cut off or not. That is to say, they were given the right to advocate to the McCaskill-Bond panel that the — that the Nicolau List should be used for integration with American pilots. If that had occurred, if they had succeeded with that argument with the panel, then the signing since 2013 would have been cut off by the panel. But they didn't start in 2016. That makes no sense. Thank you, counsel. Okay. Thank you very much. Mr. Harper, you reserve some time. Thank you, Your Honor. With respect to damages starting to run in 2013, that is just absolutely wrong, because at that particular point in time, you either would have had an MOU with 10-H, which would have delayed the implementation of the Nicolau List until McCaskill-Bond. That is one scenario. Or you would have had an MOU without 10-H, and it would not have been applicable against either the East and the West pilots. They would have continued to go forward under their respective collective bargaining agreements, and there would have been no damages at that particular point in time. And remember the fact that we were as deceived as the lawyers for the pilots about the disinformation campaign by USAPA and no word by American Airlines as to what happened, what was to happen as a result of 10-H. We did not know about the collusion until deep into Addington 3 discovery, which was in the fall of 2013. Draw the Court's attention back to our — Let me ask you about that. You just said that you learned about collusion in the fall of 2013. Yes. And this action was filed in 2017. So why isn't that still too late? The possibility of collusion came out in discovery in Addington 3 — Right. I understand what you just said, but you just said you learned about it in the fall of 2013. This action was filed in 2017. We didn't know that there were going to be any damages associated with that because we were trying to block the implementation. Except isn't it pretty much a recognized principle of statute of limitations that once you know of an injury, even if you don't know the extent of damages, the statute of limitations begins to run? Not in this case, we didn't think, because we didn't know that there was an actual breach. We didn't have a DFR as the primary part of the proof that we needed to make until we came here in 2015. So we didn't have the primary part of the cause of action, which is the DFR. Until we had that, the collusion doesn't kick in as part of the collusion cause of action. And that did not occur until 2016, when the panel came out and didn't use the NICOLA. Thank you, counsel. We appreciate the arguments from both of you. The case is submitted, and we will stand adjourned for this special sitting.
judges: Tashima, Graber, Bybee